IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

KIRSTEN SHEETS, JASON KALAGHER
AND JANSON MURPHY,

      **Plaintiffs**

v.

                                    Case No. 8:15-cv-1674-T-30JSS

SORRENTO VILLAS, SECTION 5,
ASSOCIATION, INC., a Florida corporation,
ARGUS PROPERTY MANAGEMENT, INC.,
a Florida corporation, LINDA BENFORD, JAMES
TOMPKINS, BOB BRUNO, NANCY HUBBARD,
CLAUDIA DORNBACK, HARLAN (BUD) FRIDDLE,
JACK MCCOPPEN, AND LOYOLA SIEP

      **Defendants.**

_____/

## SECOND AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

### PRELIMINARY STATEMENT

1.     This is an action for monetary damages, injunctive relief, and declaratory relief brought by the Plaintiffs, who are owners and occupants of the real property at issue.

2.     The Plaintiffs allege claims pursuant to Defendants' violations of the Fair Housing Act, Title VIII of the Civil Rights Act of 1968, as amended, 42 U.S.C.A. §§ 3601 et seq. (hereafter the "Act")

### JURISDICTION AND VENUE

3.     Jurisdiction is conferred on the court by 42 U.S.C.A. § 3613 and 28 U.S.C.A. §§ 1331 and 1343.

1

4.   Venue is in the District Court of the Middle District of Florida, Tampa division, where Defendants reside or have their principal place of business, and have sufficient contacts, pursuant to 28 U.S.C.A. § 1391(b) and (c).

## PARTIES

5.   Kirsten Sheets and Jason Kalagher are husband and wife, having been married on October 30, 2010.

6.   Janson Murphy is the son of Kirsten Sheets. At all times material hereto prior to October 3, 2014, Janson Murphy was a minor.

7.   Kirsten Sheets is presently on medical leave from her employment.

8.   Jason Kalagher is employed full time.

9.   The Plaintiff, Kirsten Sheets, is the legal titled owner of that condominium unit bearing a street address of 540 Villa Park Drive, Nokomis FL 34275. She and her now husband have resided together in the unit continuously since May 2009.

10.   The Defendant, Sorrento Villas, Section 5, Association, Inc., a Florida corporation (hereafter the "Association"), is the condominium association with the obligation to enforce the Condominium Restrictions that encumber the Plaintiff's unit and all other units within the Condominium property.

11.   The Defendant, Argus Property Management, Inc., is a Florida corporation (hereafter "Argus"), and was and is at all times material hereto the management company for the Association.

12.   The Defendant, Linda Benford ("Benford"), was and is employed by Argus, and was the individual property manager assigned to manage the Association and the

2

condominium property for Argus.

13.     The Defendant, James Tompkins ("Tompkins") is an individual who resides in a condominium unit located within the Condominium property and was and is at all times material hereto an officer and director of the Association.

14.     Defendant, Bob Bruno ("Bruno"), was and is an individual who resides in a condominium unit located within the Condominium property and was and is at all times material hereto an officer and director of the Association.

15.     Defendant, Nancy Hubbard ("Hubbard"), was and is an individual who resides in a condominium unit located within the Condominium property and was and is at all times material hereto an officer and director of the Association.

16.     Defendant, Claudia Dornback ("Dornback"), was and is an individual who resides in a condominium unit located within the Condominium property and was and is at all times material hereto an officer and director of the Association.

17.     Defendant, Harlan (Bud) Friddle ("Friddle"), was and is an individual who resides in a condominium unit located within the Condominium property and was and is at all times material hereto an officer and director of the Association.

18.     Defendant, Jack McCoppen ("McCoppen"), was and is an individual who resides in a condominium unit located within the Condominium property and was and is at all times material hereto an officer and director of the Association.

19.     Defendant, Loyola Siep ("Siep"), was and is an individual who resides in a condominium unit located within the Condominium property and was and is at all times material hereto an officer and director of the Association.

3

## COUNT I - FAILURE TO MAKE REASONABLE ACCOMMODATIONS

20.   The Plaintiff, Kirsten Sheets, incorporates herein paragraphs 1-10 and 13-19 as though fully set forth herein.

21.   This is a claim by Kirsten Sheets for damages against the Defendants, Sorrento Villas, Section 5, Association, Inc., James Tompkins, Bob Bruno, Nancy Hubbard, Claudia Dornback, Harlan (Bud) Friddle, Jack McCoppen, and Loyola Siep for their refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations are required by 42 U.S.C. and 3604(f)(3)(B).

22.   The Plaintiff, Kirsten Sheets, suffers a handicap within the meaning of 42 U.S.C. Section 3602, U.S.C. in that she suffers from physical and mental impairments which substantially limit one or more of her major life activities. In particular, she has been diagnosed with Ehlers-Danlos syndrome, Postural Orthostatic Tachycardia Syndrome (POTS) and Fibromyalgia, among other physical impairments.

23.   The Plaintiff, Kirsten Sheets, has a medical need for an animal that provides emotional support that alleviates one or more identified symptoms or effects of her disability.

24.   The Plaintiff, Kirsten Sheets, has acquired a dog that serves as her "emotional support" animal.

25.   The Plaintiff, Kirsten Sheets, is sometimes physically unable to walk, and was at all times material hereto unable to walk or constrain her emotional support animal on a leash outside her home.

4

26.     The Plaintiff and her family installed and continue to maintain an underground "invisible fence" within the common elements adjacent to their home in order to allow Kirsten Sheets to control and constrain her emotional support animal while it is outside her home.

27.     The "invisible fence" is simply a tiny non-current carrying wire placed an inch or two under ground that is invisible from the surface of the yard. It activates a pet collar with a 1.5 volt battery, worn by the Plaintiff's emotional support animal.

28.     The Defendants contend the invisible fence is a violation of the Condominium rules and declaration.

29.     In particular, the Association's Rules and Regulations (the "Rules"), **Exhibit "A"** hereto, state that no fence may be erected without Board approval.

30.     The Plaintiff contends that the invisible fence is not a "fence" within the meaning of the Rules. A fence is defined as "a structure like a wall built outdoors usually of wood or metal that separates two areas or prevents people or animals from entering or leaving." http://www.merriam-webster.com/dictionary/fence.

31.     Amended Article 6.8 of Declaration of Condominium of Sorrento Villas, Section V, a Condominium (hereafter the "Declarations") , **Exhibit "B"** hereto, states there can be no alteration or further improvements to the common or limited common elements without 2/3 approval of the other unit owners.

32.     The Defendants contend the invisible fence is an alteration or improvement done without any approval.

33.   The Plaintiff contends that the invisible fence is neither an improvement nor an alteration, and is therefore not a violation of the Declaration. The initial improvements contemplated by Article 6.8 were the villa units themselves, the physical living buildings. The invisible fence is not a unit nor a structure and thus not an improvement as contemplated in the Declaration. The invisible fence is also not an alteration in that the common elements were not altered nor changed once the invisible fence was installed.

34.   The Association initiated an arbitration proceeding with the State of Florida, Department of Business and Professional Regulation, Division of Florida Condominiums, Timeshares and Mobile Homes, styled Sorrento Villas, Section 5, Association, Inc. V. Kirsten A. Sheets, Case No: 2014-02-7000, against the Plaintiff, Kirsten Sheets, seeking an order requiring that Kirsten Sheets remove the invisible fence.

35.   The Plaintiff has repeatedly requested that she be permitted to maintain the "invisible fence" within the common elements of her home so that she can control and constrain her emotional support animal while it is outside her home. The first request was made Thanksgiving week, 2013, by Plaintiff, Jason Kalagher, on behalf of his wife, Kirsten Sheets. Several other requests were made by Plaintiffs, both verbally and in writing, since that time.

36.   The Defendant, Bob Bruno, initially approved the first request, stating he thought it was a good idea. But then the Association hired counsel and filed the arbitration. The Association did not respond to any of the other requests, and continues to pursue the

Arbitration.

37.   The invisible fence is a reasonable accommodation within the meaning of the Act.

38.   In installing the "invisible fence" the common elements, consisting of grass and plants adjacent to Plaintiff's home, was not disturbed or altered at all. All soil and sod were returned to its original condition once the small wire was placed in the ground.

39.   The Plaintiffs paid for all costs associated with the invisible fence.

40.   The Plaintiffs have notified the Association they will continue to incur all costs associated with the invisible fence.

41.   The Association has incurred no costs for the installation nor the maintenance of the invisible fence.

42.   The Association has not had to pay for anything to install or maintain the invisible fence.

43.   Dogs are permitted within the community.

44.   The individual Association officer and director, James Tompkins, personally committed or contributed to the Fair Housing violations described herein by voting at Board meetings to approve the Association's conduct described herein that violated the Fair Housing Act, by voting at Board meetings to continue the Association's conduct described herein that violated the Fair Housing Act, by not moving the Board of Directors to stop the Associations' conduct described herein that violated the Fair Housing Act, and/or by personally engaging in the conduct described herein.

45.    The individual Association officer and director, Bob Bruno, personally committed or contributed to the Fair Housing violations described herein by voting at Board meetings to approve the Association's conduct described herein that violated the Fair Housing Act, by voting at Board meetings to continue the Association's conduct described herein that violated the Fair Housing Act, by not moving the Board of Directors to stop the Associations' conduct described herein that violated the Fair Housing Act, and/or by personally engaging in the conduct described herein.

46.    The individual Association officer and director, Nancy Hubbard, personally committed or contributed to the Fair Housing violations described herein by voting at Board meetings to approve the Association's conduct described herein that violated the Fair Housing Act, by voting at Board meetings to continue the Association's conduct described herein that violated the Fair Housing Act, by not moving the Board of Directors to stop the Associations' conduct described herein that violated the Fair Housing Act, and/or by personally engaging in the conduct described herein.

47.    The individual Association officer and director, Claudia Dornback, personally committed or contributed to the Fair Housing violations described herein by voting at Board meetings to approve the Association's conduct described herein that violated the Fair Housing Act, by voting at Board meetings to continue the Association's conduct described herein that violated the Fair Housing Act, by not moving the Board of Directors to stop the Associations' conduct described herein that violated the Fair Housing Act, and/or by personally engaging in the conduct

8

described herein.

48.     The individual Association officer and director, Harlan (Bud) Friddle, personally committed or contributed to the Fair Housing violations described herein by voting at Board meetings to approve the Association's conduct described herein that violated the Fair Housing Act, by voting at Board meetings to continue the Association's conduct described herein that violated the Fair Housing Act, by not moving the Board of Directors to stop the Associations' conduct described herein that violated the Fair Housing Act, and/or by personally engaging in the conduct described herein.

49.     The individual Association officer and director, Jack McCoppen, personally committed or contributed to the Fair Housing violations described herein by voting at Board meetings to approve the Association's conduct described herein that violated the Fair Housing Act, by voting at Board meetings to continue the Association's conduct described herein that violated the Fair Housing Act, by not moving the Board of Directors to stop the Associations' conduct described herein that violated the Fair Housing Act, and/or by personally engaging in the conduct described herein.

50.     The individual Association officer and director, Loyola Siep, personally committed or contributed to the Fair Housing violations described herein by voting at Board meetings to approve the Association's conduct described herein that violated the Fair Housing Act, by voting at Board meetings to continue the Association's conduct described herein that violated the Fair Housing Act, by not moving the Board of

9

Directors to stop the Associations' conduct described herein that violated the Fair Housing Act, and/or by personally engaging in the conduct described herein.

51.    The Defendants' conduct described herein (a) was based on evil motive or intent, (b) involved reckless or callous indifference to Plaintiffs' federally protected rights, and (c) was done in the face if a perceived risk that said conduct violated the Act.

52.    Due to the failure to respond to the repeated requests for the reasonable accommodation and the continued pursuit of the Arbitration, the Plaintiff has been damaged, including costs and expenses associated with the invisible fence, and attorneys fees and costs. She has also endured great emotional distress and embarrassment. Additionally, it has caused a deprivation of her right to equal housing opportunities.

**WHEREFORE**, Plaintiff respectfully requests that this court:

(a) Assume jurisdiction of this action; and

(b) Declare the Defendants' actions complained herein to be in violation of the Fair Housing Act of 1968, as amended, 42 U.S.C.A. § 3604(f)(3)(B),

(c) Order defendants to take appropriate affirmative action to insure that the activities complained of are not engaged in again by Defendants or any of their agents; and

(d) Permanently enjoin Defendants, their agents, employees and successors from discriminating against any person in violation of the Fair Housing Act of 1968, as amended; and

(e) Award appropriate punitive and compensatory damages to Plaintiffs and against Defendants; and

(f) Award Plaintiffs' attorneys fees and costs pursuant to 42 U.S.C.A. § 3613(c)(2); and

(g) Provide such other and further relief as this court deems just and proper.

## COUNT II - FAILURE TO MAKE REASONABLE MODIFICATION

53.     The Plaintiff, Kirsten Sheets, incorporates herein paragraphs 1-10 and 13-19 as though fully set forth herein.

54.     This is a claim by Kirsten Sheets for damages against the Defendants, Sorrento Villas, Section 5, Association, Inc., James Tompkins, Bob Bruno, Nancy Hubbard, Claudia Dornback, Harlan (Bud) Friddle, Jack McCoppen, and Loyola Siep for their refusal to make reasonable modification of existing premises occupied by Plaintiff necessary to afford her full enjoyment of the premises as required by 42 U.S.C. 3604(f)(3)(A).

55.     The Plaintiff, Kirsten Sheets, suffers a handicap within the meaning of 42 U.S.C. Section 3602, U.S.C. in that she suffers from physical and mental impairments which substantially limit one or more of her major life activities. In particular, she has been diagnosed with Ehlers-Danlos syndrome, Postural Orthostatic Tachycardia Syndrome (POTS) and Fibromyalgia, among other physical impairments.

56.     The Plaintiff, Kirsten Sheets, has a medical need for an animal that provides emotional support that alleviates one or more identified symptoms or effects of her disability.

57.     The Plaintiff, Kirsten Sheets, has acquired a dog that serves as her "emotional support" animal.

58.     The Plaintiff, Kirsten Sheets, is sometimes physically unable to walk, and was at all times material hereto unable to walk or constrain her emotional support animal on a leash outside her home.

11

59.    The Plaintiff and her family installed and continue to maintain an underground "invisible fence" within the common elements adjacent to their home in order to allow Kirsten Sheets to control and constrain her emotional support animal while it is outside her home.

60.    The "invisible fence" is simply a tiny non-current carrying wire placed an inch or two under ground that is invisible from the surface of the yard. It activates a pet collar with a 1.5 volt battery, worn by the Plaintiff's emotional support animal.

61.    The Defendants contend the invisible fence is a violation of the Condominium rules and declaration.

62.    In particular, the Association's Rules and Regulations (the "Rules"), **Exhibit "A"** hereto, state that no fence may be erected without Board approval.

63.    The Plaintiff contends that the invisible fence is not a "fence" within the meaning of the Rules. A fence is defined as "a structure like a wall built outdoors usually of wood or metal that separates two areas or prevents people or animals from entering or leaving." http://www.merriam-webster.com/dictionary/fence.

64.    Amended Article 6.8 of Declaration of Condominium of Sorrento Villas, Section V, a Condominium (hereafter the "Declarations") , **Exhibit "B"** hereto, states there can be no alteration or further improvements to the common or limited common elements without 2/3 approval of the other unit owners.

65.    The Defendants contend the invisible fence is an alteration or improvement done without any approval.

12

66.   The Plaintiff contends that the invisible fence is neither an improvement nor an alteration, and is therefore not a violation of the Declaration. The initial improvements contemplated by Article 6.8 were the villa units themselves, the physical living buildings. The invisible fence is not a unit nor a structure and thus not an improvement as contemplated in the Declaration. The invisible fence is also not an alteration in that the common elements were not altered nor changed once the invisible fence was installed.

67.   The Association initiated an arbitration proceeding with the State of Florida, Department of Business and Professional Regulation, Division of Florida Condominiums, Timeshares and Mobile Homes, styled Sorrento Villas, Section 5, Association, Inc. V. Kirsten A. Sheets, Case No: 2014-02-7000, against the Plaintiff, Kirsten Sheets, seeking an order requiring that Kirsten Sheets remove the invisible fence.

68.   The Plaintiff has repeatedly requested that she be permitted to maintain the "invisible fence" within the common elements of her home so that she can control and constrain her emotional support animal while it is outside her home. The first request was made Thanksgiving week, 2013, by Plaintiff, Jason Kalagher, on behalf of his wife, Kirsten Sheets. Several other requests were made by Plaintiffs, both verbally and in writing, since that time.

69.   The Defendant, Bob Bruno, initially approved the first request, stating he thought it was a good idea. But then the Association hired counsel and filed the arbitration. The Association did not respond to any of the other requests, and continues to pursue the

Arbitration.

70.   The invisible fence is a reasonable accommodation within the meaning of the Act.

71.   In installing the "invisible fence" the common elements, consisting of grass and plants adjacent to Plaintiff's home, was not disturbed or altered at all. All soil and sod were returned to its original condition once the small wire was placed in the ground.

72.   The Plaintiffs paid for all costs associated with the invisible fence.

73.   The Plaintiffs have notified the Association they will continue to incur all costs associated with the invisible fence.

74.   The Association has incurred no costs for the installation nor the maintenance of the invisible fence.

75.   The Association has not had to pay for anything to install or maintain the invisible fence.

76.   Dogs are permitted within the community.

77.   The individual Association officer and director, James Tompkins, personally committed or contributed to the Fair Housing violations described herein by voting at Board meetings to approve the Association's conduct described herein that violated the Fair Housing Act, by voting at Board meetings to continue the Association's conduct described herein that violated the Fair Housing Act, by not moving the Board of Directors to stop the Associations' conduct described herein that violated the Fair Housing Act, and/or by personally engaging in the conduct described herein.

14

78.    The individual Association officer and director, Bob Bruno,  personally committed or contributed to the Fair Housing violations described herein by voting at Board meetings to approve the Association's conduct described herein that violated the Fair Housing Act, by voting at Board meetings to continue the Association's conduct described herein that violated the Fair Housing Act, by not moving the Board of Directors to stop the Associations' conduct described herein that violated the Fair Housing Act, and/or by personally engaging in the conduct described herein.

79.    The individual Association officer and director, Nancy Hubbard, personally committed or contributed to the Fair Housing violations described herein by voting at Board meetings to approve the Association's conduct described herein that violated the Fair Housing Act, by voting at Board meetings to continue the Association's conduct described herein that violated the Fair Housing Act, by not moving the Board of Directors to stop the Associations' conduct described herein that violated the Fair Housing Act, and/or by personally engaging in the conduct described herein.

80.    The individual Association officer and director, Claudia Dornback, personally committed or contributed to the Fair Housing violations described herein by voting at Board meetings to approve the Association's conduct described herein that violated the Fair Housing Act, by voting at Board meetings to continue the Association's conduct described herein that violated the Fair Housing Act, by not moving the Board of Directors to stop the Associations' conduct described herein that violated the Fair Housing Act, and/or by personally engaging in the conduct

described herein.

81.     The individual Association officer and director, Harlan (Bud) Friddle, personally committed or contributed to the Fair Housing violations described herein by voting at Board meetings to approve the Association's conduct described herein that violated the Fair Housing Act, by voting at Board meetings to continue the Association's conduct described herein that violated the Fair Housing Act, by not moving the Board of Directors to stop the Associations' conduct described herein that violated the Fair Housing Act, and/or by personally engaging in the conduct described herein.

82.     The individual Association officer and director, Jack McCoppen, personally committed or contributed to the Fair Housing violations described herein by voting at Board meetings to approve the Association's conduct described herein that violated the Fair Housing Act, by voting at Board meetings to continue the Association's conduct described herein that violated the Fair Housing Act, by not moving the Board of Directors to stop the Associations' conduct described herein that violated the Fair Housing Act, and/or by personally engaging in the conduct described herein.

83.     The individual Association officer and director, Loyola Siep, personally committed or contributed to the Fair Housing violations described herein by voting at Board meetings to approve the Association's conduct described herein that violated the Fair Housing Act, by voting at Board meetings to continue the Association's conduct described herein that violated the Fair Housing Act, by not moving the Board of

16

Directors to stop the Associations' conduct described herein that violated the Fair Housing Act, and/or by personally engaging in the conduct described herein.

84. The Defendants' conduct described herein (a) was based on evil motive or intent, (b) involved reckless or callous indifference to Plaintiffs' federally protected rights, and (c) was done in the face if a perceived risk that said conduct violated the Act.

85. Due to the failure to respond to the repeated requests for the reasonable accommodation and the continued pursuit of the Arbitration, the Plaintiff has been damaged, including costs and expenses associated with the invisible fence, and attorneys fees and costs. She has also endured great emotional distress and embarrassment. Additionally, it has caused a deprivation of her right to equal housing opportunities.

**WHEREFORE**, Plaintiff respectfully requests that this court:

(a) Assume jurisdiction of this action; and

(b) Declare the Defendants' actions complained herein to be in violation of the Fair Housing Act of 1968, as amended, 42 U.S.C.A. § 3604(f)(3)(A),

(c) Order defendants to take appropriate affirmative action to insure that the activities complained of are not engaged in again by Defendants or any of their agents; and

(d) Permanently enjoin Defendants, their agents, employees and successors from discriminating against any person in violation of the Fair Housing Act of 1968, as amended; and

(e) Award appropriate punitive and compensatory damages to Plaintiffs and against Defendants; and

(f) Award Plaintiffs' attorneys fees and costs pursuant to 42 U.S.C.A. § 3613(c)(2); and

(g) Provide such other and further relief as this court deems just and proper.

17

## COUNT III - RETALIATION

86.     The Plaintiffs incorporate herein paragraphs 1-10 and 13-19 as though fully set forth herein.

87.     This is a cause of action by Plaintiffs for "retaliation" against Defendants Sorrento Villas, Section 5, Association, Inc., James Tompkins, Bob Bruno, Nancy Hubbard, Claudia Dornback, Harlan (Bud) Friddle, Jack McCoppen, and Loyola Siep per 42 U.S.C. Section 3617.

88.     42 U.S.C. Section 3617 states that it is unlawful, "to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by [inter alia, section 3604] of this [Act]."

89.     On May 5, 2014, the Plaintiffs, Kirsten Sheets and Jason Kalagher, filed a complaint with the Housing and Urban Development ("HUD") against the Association, Argus and Tompkins alleging discrimination and other violations of the Act. The HUD complaint was then assigned to the State of Florida, Florida Commission on Human Relations. The filing of the HUD complaint is a protected activity within the meaning of the Act.

90.     The Plaintiff, Kirsten Sheets, made several requests for a reasonable accommodations. The requests were made as she suffers a handicap within the meaning of 42 U.S.C. Section 3602, U.S.C. in that she suffers from physical and mental impairments which substantially limit one or more of her major life activities.

18

In particular, she has been diagnosed with Ehlers-Danlos syndrome, Postural Orthostatic Tachycardia Syndrome (POTS) and Fibromyalgia, among other physical impairments.

91.    While the Plaintiff acquired a dog that serves as her "emotional support" animal, she is sometimes physically unable to walk, and was at all times material hereto unable to walk or constrain her emotional support animal on a leash outside her home. As a result, she and the other Plaintiffs installed and continue to maintain an underground "invisible fence" within the common elements adjacent to their home in order to allow Kirsten Sheets to control and constrain her emotional support animal while it is outside her home. The "invisible fence" is simply a tiny non-current carrying wire placed an inch or two under ground that is invisible from the surface of the yard. It activates a pet collar with a 1.5 volt battery, worn by the Plaintiff's emotional support animal.

92.    The Plaintiff has repeatedly requested that she be permitted to maintain the "invisible fence" within the common elements of her home so that she can control and constrain her emotional support animal while it is outside her home. The first request was made Thanksgiving week, 2013, by Plaintiff, Jason Kalagher, on behalf of his wife, Kirsten Sheets. Several other requests were made by Plaintiffs, both verbally and in writing, since that time.

93.    The Defendant, Bob Bruno, initially approved the first request, stating he thought it was a good idea. But then the Association hired counsel and filed an Arbitration described hereinafter. The Association did not respond to any of the other requests,

19

and continues to pursue the Arbitration.

94.   The invisible fence is a reasonable accommodation within the meaning of the Act.

95.   In installing the "invisible fence" the common elements, consisting of grass and plants adjacent to Plaintiff's home, was not disturbed or altered at all. All soil and sod were returned to its original condition once the small wire was placed in the ground.

96.   The Plaintiffs paid for all costs associated with the invisible fence.

97.   The Plaintiffs have notified the Association they will continue to incur all costs associated with the invisible fence.

98.   The Association has incurred no costs for the installation nor the maintenance of the invisible fence.

99.   The Association has not had to pay for anything to install or maintain the invisible fence.

100.  Dogs are permitted within the community. This is a protected activity within the meaning of the Act.

101.  The Defendants were aware of these activities.

102.  In response to these protected activities, the Defendants took adverse action against the Plaintiff, Kirsten Sheets and her family. This action includes but is not limited to the following:

    a.   The Association initiated an arbitration proceeding with the State of Florida, Department of Business and Professional Regulation, Division of Florida Condominiums, Timeshares and Mobile Homes, styled Sorrento Villas,

Section 5, Association, Inc. V. Kirsten A. Sheets, Case No: 2014-02-7000 (the "Arbitration"), against the Plaintiff, Kirsten Sheets, seeking an order requiring that Kirsten Sheets remove the invisible fence.

b.  The Defendants filed false documents and failed to produce all responsive documents with the state investigator investigating the HUD complaint.

c.  The Defendants failed and refused to produce official records to Plaintiff they were legally obligated to maintain and provide to Plaintiffs, per Section 718.111(12), F.S.

d.  The minutes of the Association's Board of Director meetings were altered.

e.  The Defendants have sent numerous violation notices to Plaintiff Kirsten Sheets' brother and his tenants. Plaintiff's brother owns another unit in the condominium community. The Plaintiff helps her brother manage the unit and with tenant issues. The Association has sent multiple infraction notices, both orally and written, to Plaintiff's brother regarding his tenants, despite not giving notices to other residents and tenants in the community engaged in the same or similar conduct.

f.  Subsequent to Plaintiff's filing of the HUD complaint, the Plaintiffs have been victims of repeated vandalism and harassment. Upon information and belief, the Defendants were the parties engaged in the conduct as no other residents of the community have been subject to vandalism or harassment during this time. Some examples of the vandalism and harassment are:

21

1.    A tack or nail was lodged into the sidewall of a tire on Plaintiff's car.

2.    All of the oil in Plaintiff's car was drained and removed.

3.    All of the air was let out of both passenger side tires of Jason Kalagher's car.

4.    Janson Murphy's car has been "keyed" multiple places on the side of his car while parked in the community.

5.    The invisible fence was cut at least 7 times.

6.    A neighbor, former board member and best friend of Tomkins, who lives next door to Plaintiffs, growls and barks at Plaintiff's emotional support animal to antagonize it and cause it to growl and bark back, calls the sheriff on Plaintiffs when no crime had occurred, texts and calls Plaintiff's brother's tenants, and has installed a motion controlled spotlight that shines on Plaintiff's home whenever anyone enters or leaves their unit. This neighbor also stole the Plaintiffs' invisible fence signs. The Defendants use the neighbor as their proxy to monitor and harass Plaintiffs.

g.    At Board meetings the Defendant Board members refuse to respond to Plaintiff's questions posed during open floor issues, yet they freely responded to questions posed by other persons in attendance.

h.   Defendant Bob Bruno has told residents of the community that the Plaintiff were suing each unit owner, when at the time the Plaintiff had sued no one.

i.   By stating in Board meetings that Plaintiffs are suing them, when no lawsuit had been filed.

j.   The Association voted to adopt a "no parking on the street" policy or rule designed specifically to prohibit Janson Murphy from parking on the street adjacent to his family's unit, since among them the Plaintiffs have three cars. Meanwhile, the Defendants and other members of the community park on the street, and the "no parking on the street" policy or rule is not enforced against them.

k.   The Defendants have selectively enforced the Declaration and the Rules against the Plaintiffs, but not others nor themselves.

l.   The Defendants are telling people in the community who were friends of the Plaintiffs to stay away from Plaintiffs.

m.   A now former Board member who voted to hire an attorney over the invisible fence and who is friends with the Defendants came over after determination of the HUD complaint and and asked Plaintiffs if they "were finally moving".

n.   Defendant Bruno walks his dogs past Plaintiffs' home. In so doing, he talks out loud "to his dogs" and tells them to "stay away from that yard" and "Yea, that is the bad place to go, I know you want to stay away from them".

o.   Defendant Bruno told Plaintiffs that the he "got together with the neighbors and every time we see your dog outside we are going to call animal control."

23

p.  The Defendants have not kept accurate Board minutes The minutes do not reflect what was actually said or what occurred. Rather, the minutes are used as a propaganda tool against Plaintiffs.

q.  The Association mailed out a false budget to members, and subsequently refusing to correct it upon multiple requests by Plaintiffs. The false budget minimized the legal fees incurred by the Association so they can continue their harassment of the Plaintiffs

r.  The Defendants refused to provide services to Plaintiffs, and have refused to respond or cooperate with legitimate issues Plaintiffs have raised. Specifically:

1.  The Plaintiffs made a request to install a solar panel. In so doing they cited Section 163.04, F.S. which states that the Association was required to approve the request. Despite that information, the Association, through attorney Mallonee, denied the request. Thereafter, once the Plaintiffs retained counsel, the Association said they would approve the request but only if the Plaintiffs agreed to sign a covenant to run with the land setting forth certain maintenance obligations. No such requirement was imposed on other residents in the community when they installed their solar panels.

2.  The Association refused to authorize or pay for repairing sewer lines to Plaintiffs' unit, in violation of their duties pursuant to the Declaration.

24

s.      In the official records of the Association, the Defendants have tried to "hide" or minimize the Association's legal expenses in order to have funds in the future to continue the retaliation against Plaintiffs.

t.      The Association has refused its obligation to remove or trim a dead tree located on the common elements adjacent to Plaintiff's unit.

u.      The Association continues to pursue the Arbitration, notwithstanding the pending HUD complaint and the Plaintiff's requests for reasonable accommodation.

v.      The Defendants refused to address Plaintiffs' request for an accounting as to payment of their assessments in that they believes they are owed a credit.

103.    The individual Association officers and director, James Tompkins, personally committed or contributed to the Fair Housing violations described herein by voting at Board meetings to approve the Association's conduct described herein that violated the Fair Housing Act, by voting at Board meetings to continue the Association's conduct described herein that violated the Fair Housing Act, by not moving the Board of Directors to stop the Associations' conduct described herein that violated the Fair Housing Act, and/or by personally engaging in the conduct described herein.

104.    The individual Association officer and director, Bob Bruno, personally committed or contributed to the Fair Housing violations described herein by voting at Board meetings to approve the Association's conduct described herein that violated the Fair Housing Act, by voting at Board meetings to continue the Association's conduct

described herein that violated the Fair Housing Act, by not moving the Board of Directors to stop the Associations' conduct described herein that violated the Fair Housing Act, and/or by personally engaging in the conduct described herein.

105.   The individual Association officer and director, Nancy Hubbard, personally committed or contributed to the Fair Housing violations described herein by voting at Board meetings to approve the Association's conduct described herein that violated the Fair Housing Act, by voting at Board meetings to continue the Association's conduct described herein that violated the Fair Housing Act, by not moving the Board of Directors to stop the Associations' conduct described herein that violated the Fair Housing Act, and/or by personally engaging in the conduct described herein.

106.   The individual Association officer and director, Claudia Dornback, personally committed or contributed to the Fair Housing violations described herein by voting at Board meetings to approve the Association's conduct described herein that violated the Fair Housing Act, by voting at Board meetings to continue the Association's conduct described herein that violated the Fair Housing Act, by not moving the Board of Directors to stop the Associations' conduct described herein that violated the Fair Housing Act, and/or by personally engaging in the conduct described herein.

107.   The individual Association officer and director, Harlan (Bud) Friddle, personally committed or contributed to the Fair Housing violations described herein by voting at Board meetings to approve the Association's conduct described herein that

violated the Fair Housing Act, by voting at Board meetings to continue the Association's conduct described herein that violated the Fair Housing Act, by not moving the Board of Directors to stop the Associations' conduct described herein that violated the Fair Housing Act, and/or by personally engaging in the conduct described herein.

108. The individual Association officer and director, Jack McCoppen, personally committed or contributed to the Fair Housing violations described herein by voting at Board meetings to approve the Association's conduct described herein that violated the Fair Housing Act, by voting at Board meetings to continue the Association's conduct described herein that violated the Fair Housing Act, by not moving the Board of Directors to stop the Associations' conduct described herein that violated the Fair Housing Act, and/or by personally engaging in the conduct described herein.

109. The individual Association officer and director, Loyola Siep, personally committed or contributed to the Fair Housing violations described herein by voting at Board meetings to approve the Association's conduct described herein that violated the Fair Housing Act, by voting at Board meetings to continue the Association's conduct described herein that violated the Fair Housing Act, by not moving the Board of Directors to stop the Associations' conduct described herein that violated the Fair Housing Act, and/or by personally engaging in the conduct described herein.

110. The Defendants' conduct described herein (a) was based on evil motive or intent, (b) involved reckless or callous indifference to Plaintiffs' federally protected rights, and

27

(c) was done in the face if a perceived risk that said conduct violated the Act.

111.    Due to the retaliation, the Plaintiffs have been damaged, including costs and expenses associated with the invisible fence, and attorneys fees and costs. They have also endured great emotional distress and embarrassment, and damage to their reputation. Additionally, it has caused a deprivation of their rights to equal housing opportunities.

**WHEREFORE**, Plaintiffs respectfully requests that this court:

(a) Assume jurisdiction of this action; and

(b) Declare the Defendants' actions complained herein to be in violation of the Fair Housing Act of 1968, as amended, 42 U.S.C.A. § 3617, et. seq.

(c) Order Defendants to take appropriate affirmative action to insure that the activities complained of are not engaged in again by Defendants or any of their agents; and

(d) Permanently enjoin Defendants, their agents, employees and successors from discriminating against any person in violation of the Fair Housing Act of 1968, as amended; and

(e) Award appropriate punitive and compensatory damages to Plaintiffs and against Defendants; and

(f) Award Plaintiffs' attorneys fees and costs pursuant to 42 U.S.C.A. § 3613(c)(2); and

(g) Provide such other and further relief as this court deems just and proper.

## COUNT IV - DISCRIMINATION - FAMILIAL STATUS

112.    The Plaintiffs incorporate herein paragraphs 1-10 and 13-19 as though fully set forth herein.

113.    This is a cause of action for discrimination against Defendants, Sorrento Villas, Section 5, Association, Inc., James Tompkins, Bob Bruno, Nancy Hubbard, Claudia

Dornback, Harlan (Bud) Friddle, Jack McCoppen, and Loyola Siep, on the basis of familial status in violation of 42 U.S.C. Section 3604(b).

114.   At all times material hereto, the Association claimed that children could not play on certain common elements located near the Plaintiffs' home. In furtherance of this claim, the Association either installed or allowed others to install numerous "no trespassing" signs on the common elements at issue. The Association also voted to approve, and then enforced, the no children playing rule.

115.   Neither the Rules nor the Declaration prohibited children from playing on the common elements.

116.   The common elements at issue were located near Plaintiff's unit. The only persons who accessed or used the common elements at issue was Janson Murphy, then a minor, and his minor friends, who would play on the common elements.

117.   The Association, directly and indirectly through others, called the sheriff claiming that the Plaintiff's son was trespassing on the common elements.

118.   On several occasions, the Association notified the Plaintiffs that Janson Murphy and his friends could not play on the common elements.

119.   The Rules prohibited the "no trespassing" signs.

120.   The Rules did not prohibit access to the common elements nor children playing on the common elements.

121.   The individual Association officers and director, James Tompkins, personally committed or contributed to the Fair Housing violations described herein by voting at Board meetings to approve the Association's conduct described herein that

29

violated the Fair Housing Act, by voting at Board meetings to continue the Association's conduct described herein that violated the Fair Housing Act, by not moving the Board of Directors to stop the Associations' conduct described herein that violated the Fair Housing Act, and/or by personally engaging in the conduct described herein.

122.    The individual Association officer and director, Bob Bruno,  personally committed or contributed to the Fair Housing violations described herein by voting at Board meetings to approve the Association's conduct described herein that violated the Fair Housing Act, by voting at Board meetings to continue the Association's conduct described herein that violated the Fair Housing Act, by not moving the Board of Directors to stop the Associations' conduct described herein that violated the Fair Housing Act, and/or by personally engaging in the conduct described herein.

123.    The individual Association officer and director, Nancy Hubbard, personally committed or contributed to the Fair Housing violations described herein by voting at Board meetings to approve the Association's conduct described herein that violated the Fair Housing Act, by voting at Board meetings to continue the Association's conduct described herein that violated the Fair Housing Act, by not moving the Board of Directors to stop the Associations' conduct described herein that violated the Fair Housing Act, and/or by personally engaging in the conduct described herein.

124.    The individual Association officer and director, Claudia Dornback, personally committed or contributed to the Fair Housing violations described herein by voting

at Board meetings to approve the Association's conduct described herein that violated the Fair Housing Act, by voting at Board meetings to continue the Association's conduct described herein that violated the Fair Housing Act, by not moving the Board of Directors to stop the Associations' conduct described herein that violated the Fair Housing Act, and/or by personally engaging in the conduct described herein.

125.   The individual Association officer and director, Harlan (Bud) Friddle, personally committed or contributed to the Fair Housing violations described herein by voting at Board meetings to approve the Association's conduct described herein that violated the Fair Housing Act, by voting at Board meetings to continue the Association's conduct described herein that violated the Fair Housing Act, by not moving the Board of Directors to stop the Associations' conduct described herein that violated the Fair Housing Act, and/or by personally engaging in the conduct described herein.

126.   The individual Association officer and director, Jack McCoppen, personally committed or contributed to the Fair Housing violations described herein by voting at Board meetings to approve the Association's conduct described herein that violated the Fair Housing Act, by voting at Board meetings to continue the Association's conduct described herein that violated the Fair Housing Act, by not moving the Board of Directors to stop the Associations' conduct described herein that violated the Fair Housing Act, and/or by personally engaging in the conduct described herein.

127.   The individual Association officer and director, Loyola Siep, personally committed or contributed to the Fair Housing violations described herein by voting at Board meetings to approve the Association's conduct described herein that violated the Fair Housing Act, by voting at Board meetings to continue the Association's conduct described herein that violated the Fair Housing Act, by not moving the Board of Directors to stop the Associations' conduct described herein that violated the Fair Housing Act, and/or by personally engaging in the conduct described herein.

128.   The Defendants conduct discriminated against the Defendants because of familial status, in violation of 42 U.S.C. Section 3604(b).

129.   The Defendants' conduct described herein (a) was based on evil motive or intent, (b) involved reckless or callous indifference to Plaintiffs' federally protected rights, and (c) was done in the face if a perceived risk that said conduct violated the Act.

130.   Due to the discrimination, the Plaintiffs have been damaged, including attorneys fees and costs. They have also endured great emotional distress and embarrassment. Additionally, it has caused a deprivation of their rights to equal housing opportunities.

**WHEREFORE**, Plaintiff respectfully requests that this court:

(a) Assume jurisdiction of this action; and

(b) Declare the Defendants' actions complained herein to be in violation of the Fair Housing Act of 1968, as amended, 42 U.S.C.A. § 3604(b), et. seq.

(c) Order Defendants to take appropriate affirmative action to insure that the activities complained of are not engaged in again by Defendants or any of their agents; and

(d) Permanently enjoin Defendants, their agents, employees and successors from discriminating against any person in violation of the Fair Housing Act of 1968, as amended; and

(e) Award appropriate punitive and compensatory damages to Plaintiffs and against Defendants; and

(f) Award Plaintiffs' attorneys fees and costs pursuant to 42 U.S.C.A. § 3613(c)(2); and

(g) Provide such other and further relief as this court deems just and proper.

### COUNT V - FAILURE TO MAKE REASONABLE ACCOMMODATIONS

131.    The Plaintiff, Kirsten Sheets, incorporates herein paragraphs 1 through 12 as though fully set forth herein.

132.    This is a claim by Kirsten Sheets for damages against the Defendant, Argus and Benford, for their refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations are required by 42 U.S.C. and 3604(f)(3)(B).

133.    The Plaintiff, Kirsten Sheets, suffers a handicap within the meaning of 42 U.S.C. Section 3602, U.S.C. in that she suffers from physical and mental impairments which substantially limit one or more of her major life activities. In particular, she has been diagnosed with Ehlers-Danlos syndrome, Postural Orthostatic Tachycardia Syndrome (POTS) and Fibromyalgia, among other physical impairments.

134.    The Plaintiff, Kirsten Sheets, has a medical need for an animal that provides emotional support that alleviates one or more identified symptoms or effects of her disability.

135.    The Plaintiff, Kirsten Sheets, has acquired a dog that serves as her "emotional support" animal.

136. The Plaintiff, Kirsten Sheets, is sometimes physically unable to walk, and was at all times material hereto unable to walk or constrain her emotional support animal on a leash outside her home.

137. The Plaintiff and her family installed and continue to maintain an underground "invisible fence" within the common elements adjacent to their home in order to allow Kirsten Sheets to control and constrain her emotional support animal while it is outside her home.

138. The "invisible fence" is simply a tiny non-current carrying wire placed an inch or two under ground that is invisible from the surface of the yard. It activates a pet collar with a 1.5 volt battery, worn by the Plaintiff's emotional support animal.

139. The Association contends the invisible fence is a violation of the Condominium rules and declaration.

140. In particular, the Association's Rules and Regulations (the "Rules"), **Exhibit "A"** hereto, state that no fence may be erected without Board approval.

141. The Plaintiff contends that the invisible fence is not a "fence" within the meaning of the Rules. A fence is defined as "a structure like a wall built outdoors usually of wood or metal that separates two areas or prevents people or animals from entering or leaving." http://www.merriam-webster.com/dictionary/fence.

142. Amended Article 6.8 of Declaration of Condominium of Sorrento Villas, Section V, a Condominium (hereafter the "Declarations"), **Exhibit "B"** hereto, states there can be no alteration or further improvements to the common or limited common elements without 2/3 approval of the other unit owners.

143.   The Association contends the invisible fence is an alteration or improvement done without any approval.

144.   The Plaintiff contends that the invisible fence is neither an improvement nor an alteration, and is therefore not a violation of the Declaration. The initial improvements contemplated by Article 6.8 were the villa units themselves, the physical living buildings. The invisible fence is not a unit nor a structure and thus not an improvement as contemplated in the Declaration. The invisible fence is also not an alteration in that the common elements were not altered nor changed once the invisible fence was installed.

145.   The Association initiated an arbitration proceeding with the State of Florida, Department of Business and Professional Regulation, Division of Florida Condominiums, Timeshares and Mobile Homes, styled: Sorrento Villas, Section 5, Association, Inc. V. Kirsten A. Sheets, Case No: 2014-02-7000, against the Plaintiff, Kirsten Sheets, seeking an order requiring that Kirsten Sheets remove the invisible fence.

146.   The Plaintiff has repeatedly requested from the Association that she be permitted to maintain the "invisible fence" within the common elements of her home so that she can control and constrain her emotional support animal while it is outside her home. The first request was made Thanksgiving week, 2013, by Plaintiff, Jason Kalagher, on behalf of his wife, Kirsten Sheets. Several other requests were made by Plaintiffs, both verbally and in writing, since that time.

147.   The Defendant, Bob Bruno, initially approved the first request, stating he thought it

was a good idea. But then the Association hired counsel and filed the arbitration. The Association did not respond to any of the other requests, and continues to pursue the Arbitration.

148. The invisible fence is a reasonable accommodation within the meaning of the Act.

149. In installing the "invisible fence" the common elements, consisting of grass and plants adjacent to Plaintiff's home, was not disturbed or altered at all. All soil and sod were returned to its original condition once the small wire was placed in the ground.

150. The Plaintiffs paid for all costs associated with the invisible fence.

151. The Plaintiffs have notified the Association they will continue to incur all costs associated with the invisible fence.

152. The Association has incurred no costs for the installation nor the maintenance of the invisible fence.

153. The Association has not had to pay for anything to install or maintain the invisible fence.

154. Dogs are permitted within the community.

155. Argus was hired by the Association to manage this subject condominium property. Its duties included advising the Association on matters that involved the condominium property, including the applicability of the Fair Housing Act. As the property manager for the Association, Argus also received training on the Fair Housing Act as part of its state licensing requirements. In response to the Plaintiff's requests described above, Argus (a) advised the Association that they should not

respond to the requests for a reasonable accommodation because the Plaintiff had not sought approval to install the invisible fence per the Declaration and Rules when Argus knew or should have known that the failure to respond was a violation of the Fair Housing Act, (b) advised the Association that they should not permit the reasonable accommodation because Plaintiff had not sought approval to install the invisible fence per the Declaration and Rules when Argus knew or should have known that the denial of the request was a violation of the Fair Housing Act, (c) elected to say nothing to the Association about the requests for a reasonable accommodation when, as the property manager, Argus had a duty to advise the Association that it should make the requested reasonable accommodation to the Plaintiff, (d) implemented the Association's decision to deny Plaintiff's request for a reasonable accommodation by sending plaintiff, Kirsten Sheets, letters demanding the invisible fence be removed, (e) implemented, coordinated and assisted the Association in the filing and the pursuit of the Arbitration, and (f) and otherwise implemented and enforced the Association's conduct described herein, all despite knowing that said conduct was a violation of the Plaintiffs' rights under the Fair Housing Act.

156.   Benford, as the employee of Argus and the individual property manager assigned to the subject condominium community on behalf of Argus, advised the Association on matters that involved the condominium property, including the applicability of the Fair Housing Act. As the property manager for the Association and an employee of Argus, she also received training on the Fair Housing Act as part of her state

37

licensing requirements. In response to the Plaintiff's requests described above, Benford (a) advised the Association that they should not respond to the requests for a reasonable accommodation because the Plaintiff had not sought approval to install the invisible fence per the Declaration and Rules when Benford knew or should have known that the failure to respond was a violation of the Fair Housing Act, (b) advised the Association that they should not permit the reasonable accommodation because Plaintiff had not sought approval to install the invisible fence per the Declaration and Rules when Benford knew or should have known that the denial of the request was a violation of the Fair Housing Act, (c) elected to say nothing to the Association about the requests for a reasonable accommodation when, as the property manager, Benford had a duty to advise the Association that it should make the requested reasonable accommodation to the Plaintiff, (d) implemented the Association's decision to deny Plaintiff's request for a reasonable accommodation by sending plaintiff, Kirsten Sheets, letters demanding the invisible fence be removed, (e) implemented, coordinated and assisted the Association in the filing and the pursuit of the Arbitration, and (f) and otherwise implemented and enforced the Association's conduct described herein, all despite knowing that said conduct was a violation of the Plaintiffs' rights under the Fair Housing Act.

157.   The Defendants' conduct described herein (a) was based on evil motive or intent, (b) involved reckless or callous indifference to Plaintiffs' federally protected rights, and (c) was done in the face of a perceived risk that said conduct violated the Act.

158.   Due to the failure to respond to the repeated requests for the reasonable

38

accommodation and the continued pursuit of the Arbitration, the Plaintiff has been damaged, including costs and expenses associated with the invisible fence, and attorneys fees and costs. She has also endured great emotional distress and embarrassment. Additionally, it has caused a deprivation of her right to equal housing opportunities.

WHEREFORE, Plaintiff respectfully requests that this court:

(a) Assume jurisdiction of this action; and

(b) Declare the Defendants' actions complained herein to be in violation of the Fair Housing Act of 1968, as amended, 42 U.S.C.A. § 3604(f)(3)(B),

(c) Order defendants to take appropriate affirmative action to insure that the activities complained of are not engaged in again by Defendants or any of their agents; and

(d) Permanently enjoin Defendants, their agents, employees and successors from discriminating against any person in violation of the Fair Housing Act of 1968, as amended; and

(e) Award appropriate punitive and compensatory damages to Plaintiffs and against Defendants; and

(f) Award Plaintiffs' attorneys fees and costs pursuant to 42 U.S.C.A. § 3613(c)(2); and

(g) Provide such other and further relief as this court deems just and proper.

## COUNT VI - FAILURE TO MAKE REASONABLE MODIFICATIONS

159.    The Plaintiff, Kirsten Sheets, incorporates herein paragraphs 1 through 12 as though fully set forth herein.

160.    This is a claim by Kirsten Sheets for damages against the Defendant, Argus and Benford, for their refusal to make reasonable modification of existing premises occupied by Plaintiff necessary to afford her full enjoyment of the premises as

required by 42 U.S.C. 3604(f)(3)(A).

161.   The Plaintiff, Kirsten Sheets, suffers a handicap within the meaning of 42 U.S.C. Section 3602, U.S.C. in that she suffers from physical and mental impairments which substantially limit one or more of her major life activities. In particular, she has been diagnosed with Ehlers-Danlos syndrome, Postural Orthostatic Tachycardia Syndrome (POTS) and Fibromyalgia, among other physical impairments.

162.   The Plaintiff, Kirsten Sheets, has a medical need for an animal that provides emotional support that alleviates one or more identified symptoms or effects of her disability.

163.   The Plaintiff, Kirsten Sheets, has acquired a dog that serves as her "emotional support" animal.

164.   The Plaintiff, Kirsten Sheets, is sometimes physically unable to walk, and was at all times material hereto unable to walk or constrain her emotional support animal on a leash outside her home.

165.   The Plaintiff and her family installed and continue to maintain an underground "invisible fence" within the common elements adjacent to their home in order to allow Kirsten Sheets to control and constrain her emotional support animal while it is outside her home.

166.   The "invisible fence" is simply a tiny non-current carrying wire placed an inch or two under ground that is invisible from the surface of the yard. It activates a pet collar with a 1.5 volt battery, worn by the Plaintiff's emotional support animal.

167.   The Association contends the invisible fence is a violation of the Condominium rules

and declaration.

168.    In particular, the Association's Rules and Regulations (the "Rules"), **Exhibit "A"** hereto, state that no fence may be erected without Board approval.

169.    The Plaintiff contends that the invisible fence is not a "fence" within the meaning of the Rules. A fence is defined as "a structure like a wall built outdoors usually of wood or metal that separates two areas or prevents people or animals from entering or leaving." http://www.merriam-webster.com/dictionary/fence.

170.    Amended Article 6.8 of Declaration of Condominium of Sorrento Villas, Section V, a Condominium (hereafter the "Declarations") , **Exhibit "B"** hereto, states there can be no alteration or further improvements to the common or limited common elements without 2/3 approval of the other unit owners.

171.    The Association contends the invisible fence is an alteration or improvement done without any approval.

172.    The Plaintiff contends that the invisible fence is neither an improvement nor an alteration, and is therefore not a violation of the Declaration. The initial improvements contemplated by Article 6.8 were the villa units themselves, the physical living buildings. The invisible fence is not a unit nor a structure and thus not an improvement as contemplated in the Declaration. The invisible fence is also not an alteration in that the common elements were not altered nor changed once the invisible fence was installed.

173.    The Association initiated an arbitration proceeding with the State of Florida, Department of Business and Professional Regulation, Division of Florida

Condominiums, Timeshares and Mobile Homes, styled: Sorrento Villas, Section 5, Association, Inc. V. Kirsten A. Sheets, Case No: 2014-02-7000, against the Plaintiff, Kirsten Sheets, seeking an order requiring that Kirsten Sheets remove the invisible fence.

174.   The Plaintiff has repeatedly requested from the Association that she be permitted to maintain the "invisible fence" within the common elements of her home so that she can control and constrain her emotional support animal while it is outside her home. The first request was made Thanksgiving week, 2013, by Plaintiff, Jason Kalagher, on behalf of his wife, Kirsten Sheets. Several other requests were made by Plaintiffs, both verbally and in writing, since that time.

175.   The Defendant, Bob Bruno, initially approved the first request, stating he thought it was a good idea. But then the Association hired counsel and filed the arbitration. The Association did not respond to any of the other requests, and continues to pursue the Arbitration.

176.   The invisible fence is a reasonable accommodation within the meaning of the Act.

177.   In installing the "invisible fence" the common elements, consisting of grass and plants adjacent to Plaintiff's home, was not disturbed or altered at all. All soil and sod were returned to its original condition once the small wire was placed in the ground.

178.   The Plaintiffs paid for all costs associated with the invisible fence.

179.   The Plaintiffs have notified the Association they will continue to incur all costs associated with the invisible fence.

42

180.    The Association has incurred no costs for the installation nor the maintenance of the invisible fence.

181.    The Association has not had to pay for anything to install or maintain the invisible fence.

182.    Dogs are permitted within the community.

183.    Argus was hired by the Association to manage this subject condominium property. Its duties included advising the Association on matters that involved the condominium property, including the applicability of the Fair Housing Act. As the property manager for the Association, Argus also received training on the Fair Housing Act as part of its state licensing requirements. In response to the Plaintiff's requests described above, Argus (a) advised the Association that they should not respond to the requests for a reasonable accommodation because the Plaintiff had not sought approval to install the invisible fence per the Declaration and Rules when Argus knew or should have known that the failure to respond was a violation of the Fair Housing Act, (b) advised the Association that they should not permit the reasonable accommodation because Plaintiff had not sought approval to install the invisible fence per the Declaration and Rules when Argus knew or should have known that the denial of the request was a violation of the Fair Housing Act, (c) elected to say nothing to the Association about the requests for a reasonable accommodation when, as the property manager, Argus had a duty to advise the Association that it should make the requested reasonable accommodation to the Plaintiff, (d) implemented the Association's decision to deny Plaintiff's request for

43

a reasonable accommodation by sending plaintiff, Kirsten Sheets, letters demanding the invisible fence be removed, (e) implemented, coordinated and assisted the Association in the filing and the pursuit of the Arbitration, and (f) and otherwise implemented and enforced the Association's conduct described herein, all despite knowing that said conduct was a violation of the Plaintiffs' rights under the Fair Housing Act.

184.    Benford, as the employee of Argus and the individual property manager assigned to the subject condominium community on behalf of Argus, advised the Association on matters that involved the condominium property, including the applicability of the Fair Housing Act. As the property manager for the Association and an employee of Argus, she also received training on the Fair Housing Act as part of her state licensing requirements. In response to the Plaintiff's requests described above, Benford (a) advised the Association that they should not respond to the requests for a reasonable accommodation because the Plaintiff had not sought approval to install the invisible fence per the Declaration and Rules when Benford knew or should have known that the failure to respond was a violation of the Fair Housing Act, (b) advised the Association that they should not permit the reasonable accommodation because Plaintiff had not sought approval to install the invisible fence per the Declaration and Rules when Benford knew or should have known that the denial of the request was a violation of the Fair Housing Act, (c) elected to say nothing to the Association about the requests for a reasonable accommodation when, as the property manager, Benford had a duty to advise the Association that it should make the requested

reasonable accommodation to the Plaintiff, (d) implemented the Association's decision to deny Plaintiff's request for a reasonable accommodation by sending plaintiff, Kirsten Sheets, letters demanding the invisible fence be removed, (e) implemented, coordinated and assisted the Association in the filing and the pursuit of the Arbitration, and (f) and otherwise implemented and enforced the Association's conduct described herein, all despite knowing that said conduct was a violation of the Plaintiffs' rights under the Fair Housing Act.

185.    The Defendants' conduct described herein (a) was based on evil motive or intent, (b) involved reckless or callous indifference to Plaintiffs' federally protected rights, and (c) was done in the face of a perceived risk that said conduct violated the Act.

186.    Due to the failure to respond to the repeated requests for the reasonable accommodation and the continued pursuit of the Arbitration, the Plaintiff has been damaged, including costs and expenses associated with the invisible fence, and attorneys fees and costs. She has also endured great emotional distress and embarrassment. Additionally, it has caused a deprivation of her right to equal housing opportunities.

**WHEREFORE**, Plaintiff respectfully requests that this court:

(a) Assume jurisdiction of this action; and

(b) Declare the Defendants' actions complained herein to be in violation of the Fair Housing Act of 1968, as amended, 42 U.S.C.A. § 3604(f)(3)(A),

(c) Order defendants to take appropriate affirmative action to insure that the activities complained of are not engaged in again by Defendants or any of their agents; and

45

(d) Permanently enjoin Defendants, their agents, employees and successors from discriminating against any person in violation of the Fair Housing Act of 1968, as amended; and

(e) Award appropriate punitive and compensatory damages to Plaintiffs and against Defendants; and

(f) Award Plaintiffs' attorneys fees and costs pursuant to 42 U.S.C.A. § 3613(c)(2); and

(g) Provide such other and further relief as this court deems just and proper.

## COUNT VII - RETALIATION

187.  The Plaintiffs incorporate herein paragraphs 1 through 12 as though fully set forth herein.

188.  This is a cause of action by Plaintiffs for "retaliation" against all Defendants per 42 U.S.C. Section 3617.

189.  42 U.S.C. Section 3617 states that it is unlawful, "to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by [inter alia, section 3604] of this [Act]."

190.  On May 5, 2014, the Plaintiffs, Kirsten Sheets and Jason Kalagher, filed a complaint with the Housing and Urban Development ("HUD") against the Association, Argus and Tompkins alleging discrimination and other violations of the Act. The HUD complaint was then assigned to the State of Florida, Florida Commission on Human Relations. The filing of the HUD complaint is a protected activity within the meaning of the Act.

46

191.    The Plaintiff, Kirsten Sheets, made several requests for a reasonable accommodations. The requests were made as she suffers a handicap within the meaning of 42 U.S.C. Section 3602, U.S.C. in that she suffers from physical and mental impairments which substantially limit one or more of her major life activities. In particular, she has been diagnosed with Ehlers-Danlos syndrome, Postural Orthostatic Tachycardia Syndrome (POTS) and Fibromyalgia, among other physical impairments.

192.    While the Plaintiff acquired a dog that serves as her "emotional support" animal, she is sometimes physically unable to walk, and was at all times material hereto unable to walk or constrain her emotional support animal on a leash outside her home. As a result, she and the other Plaintiffs installed and continue to maintain an underground "invisible fence" within the common elements adjacent to their home in order to allow Kirsten Sheets to control and constrain her emotional support animal while it is outside her home. The "invisible fence" is simply a tiny non-current carrying wire placed an inch or two under ground that is invisible from the surface of the yard. It activates a pet collar with a 1.5 volt battery, worn by the Plaintiff's emotional support animal.

193.    The Plaintiff has repeatedly requested that she be permitted to maintain the "invisible fence" within the common elements of her home so that she can control and constrain her emotional support animal while it is outside her home. The first request was made Thanksgiving week, 2013, by Plaintiff, Jason Kalagher, on behalf of his wife, Kirsten Sheets. Several other requests were made by Plaintiffs, both verbally and in

writing, since that time.

194.   The Association, through an officer and director, initially approved the first request, stating he thought it was a good idea. But then the Association hired counsel and filed the Arbitration. The Association did not respond to any of the other requests, and continues to pursue the Arbitration.

195.   The invisible fence is a reasonable accommodation within the meaning of the Act.

196.   In installing the "invisible fence" the common elements, consisting of grass and plants adjacent to Plaintiff's home, was not disturbed or altered at all. All soil and sod were returned to its original condition once the small wire was placed in the ground.

197.   The Plaintiffs paid for all costs associated with the invisible fence.

198.   The Plaintiffs have notified the Association they will continue to incur all costs associated with the invisible fence.

199.   The Association has incurred no costs for the installation nor the maintenance of the invisible fence.

200.   The Association has not had to pay for anything to install or maintain the invisible fence.

201.   Dogs are permitted within the community. This is a protected activity within the meaning of the Act.

202.   The Defendants, Argus and Benford, were aware of these activities.

203.   In response to these protected activities, the Defendants took adverse action against the Plaintiff, Kirsten Sheets and her family. This action includes but is not limited to

the following:

a.  The Association initiated an arbitration proceeding with the State of Florida, Department of Business and Professional Regulation, Division of Florida Condominiums, Timeshares and Mobile Homes, styled Sorrento Villas, Section 5, Association, Inc. V. Kirsten A. Sheets, Case No: 2014-02-7000 (the "Arbitration"), against the Plaintiff, Kirsten Sheets, seeking an order requiring that Kirsten Sheets remove the invisible fence. The Association was filed based on the advise and recommendation by Argus and Benford, who also implemented, coordinated and assisted the Association in the filing and the pursuit of the Arbitration,

b.  The Defendants, Argus and Benford, filed false documents and failed to produce all responsive documents with the state investigator investigating the HUD complaint.

c.  The Defendants, Argus and Benford, failed and refused to produce official records to Plaintiff that they, as the property manager for the Association, was legally obligated to maintain and provide to Plaintiffs , per Section 718.111(12), F.S.

d.  The Defendants, Argus and Benford, altered the minutes of the Association's Board of Director meetings..

e.  The Defendants, Argus and Benford, have sent numerous violation notices on behalf of the Association to Plaintiff Kirsten Sheets' brother and his tenants. Plaintiff's brother owns another unit in the condominium

community. The Plaintiff helped her brother manage the unit and helped with tenant issues. The Defendant, Argus, through Benford, have sent numerous violation notices on behalf of the Association, both orally and written, to Plaintiff's brother regarding his tenants, despite not giving notices to other residents and tenants in the community engaged in the same or similar conduct.

f.   The Defendants, Argus and Benford, have stated in Board meetings that Plaintiffs are suing them, when no lawsuit had been filed.

g.   The Association asserted a "no parking on the street" policy or rule existed to prohibit Janson Murphy from parking on the street adjacent to his family's unit, since among them the Plaintiffs have three cars, even when no such rule existed. Late the Association voted to adopt such a rule. The Defendants, Argus and Benford enforced the rule, even when none existed, and only sought to enforce the new rule against Janson Murphy, but not against the board members or other members of the community who routinely parked on the street.

h.   The Defendants, Argus and Benford, on behalf of the Association, are selectively enforcing the Declaration and the Rules against the Plaintiffs, but not others. In particular, many board members, have altered the common elements in various ways without gaining prior approval per the Declaration and Rules. The Defendants, Argus and Benford, in retaliation, have consistently advised the Association to enforce the Declaration and Rules

against the Plaintiffs, but not others, and/or have failed to advise the Association that the selective enforcement in retaliation for Plaintiffs' requests for reasonable accommodations, and in filing the HUD complaint, is a violation of the Fair Housing Act.

i.  The Defendants, Argus and Benford, have not kept accurate Board minutes for the Association. The minutes do not reflect what was actually said or what occurred. Rather, the minutes are used as a propaganda tool against Plaintiffs.

j.  The Defendants, Argus and Benford, on behalf of the Association, knowingly mailed out to members a false budget that minimized the legal fees incurred by the Association so they can continue their harassment of the Plaintiffs

k.  The Defendants, Argus and Benford, recommended to the Association that it refuse to provide services to the Plaintiffs, and themselves, as the property manager, have refused to respond or cooperate with legitimate issues Plaintiffs have raised. Specifically:

1.  The Plaintiffs made a request to the Association, through Argus and Benford, to install a solar panel. In so doing they cited Section 163.04, F.S. which states that the Association was required to approve the request. Despite that information, the Defendant, Argus, through Benford, recommended to the Association that the request be denied. Thereafter, once the Plaintiffs retained counsel, the Association said they would approve the request but only if the

51

Plaintiffs agreed to sign a covenant to run with the land setting forth certain maintenance obligations.  No such requirement was imposed on other residents in the community when they installed their solar panels.

2. The Association, relying upon the advice of and through Defendants, Argus and Benford, refused to authorize or pay for repairing sewer lines to Plaintiffs' unit, in clear violation of the Association's duties pursuant to the Declaration.

l. In the official records of the Association, the Defendants, Argus and Benford, have tried to "hide" or minimize the Association's legal expenses in order to have funds in the future to continue the retaliation against Plaintiffs.

m. The Association, acting on the advice of and through Defendants, Argus and Benford, have refused its obligation to remove or trim a dead tree located on the common elements adjacent to Plaintiff's unit.

n. The Association, acting in part on the advice of and through Defendants, Argus and Benford, continues to pursue the Arbitration, notwithstanding the pending HUD complaint and the Plaintiff's requests for reasonable accommodation.

o. The Defendants, Argus and Benford, refused to address Plaintiffs' request for an accounting as to payment of their assessments in that they believes they are owed a credit.

p.    The Defendant Argus contacted Plaintiff, Kirsten Sheets' employer and tried to have her fired from her job.

204.   Argus was hired by the Association to manage this subject condominium property. Its duties included advising the Association on matters that involved the condominium property, including the applicability of the Fair Housing Act. As the property manager for the Association, Argus also received training on the Fair Housing Act as part of its state licensing requirements. Argus personally engaged in the above-described conduct, and otherwise implemented and enforced the Association's conduct described herein, all despite knowing that said conduct was a violation of the Plaintiffs' rights under the Fair Housing Act.

205.   Benford, as the employee of Argus and the individual property manager assigned to the subject condominium community on behalf of Argus, advised the Association on matters that involved the condominium property, including the applicability of the Fair Housing Act. As the property manager for the Association and an employee of Argus, she also received training on the Fair Housing Act as part of her state licensing requirements. Benford personally engaged in the above-described conduct, and otherwise implemented and enforced the Association's conduct described herein, all despite knowing that said conduct was a violation of the Plaintiffs' rights under the Fair Housing Act.

206.   The Defendants' conduct described herein (a) was based on evil motive or intent, (b) involved reckless or callous indifference to Plaintiffs' federally protected rights, and (c) was done in the face if a perceived risk that said conduct violated the Act.

53

207.    Due to the retaliation, the Plaintiffs have been damaged, including costs and expenses associated with the invisible fence, and attorneys fees and costs. They have also endured great emotional distress and embarrassment, and damage to their reputation. Additionally, it has caused a deprivation of their rights to equal housing opportunities.

**WHEREFORE**, Plaintiffs respectfully requests that this court:

(a) Assume jurisdiction of this action; and

(b) Declare the Defendants' actions complained herein to be in violation of the Fair Housing Act of 1968, as amended, 42 U.S.C.A. § 3617, et. seq.

(c) Order Defendants to take appropriate affirmative action to insure that the activities complained of are not engaged in again by Defendants or any of their agents; and

(d) Permanently enjoin Defendants, their agents, employees and successors from discriminating against any person in violation of the Fair Housing Act of 1968, as amended; and

(e) Award appropriate punitive and compensatory damages to Plaintiffs and against Defendants; and

(f) Award Plaintiffs' attorneys fees and costs pursuant to 42 U.S.C.A. § 3613(c)(2); and

(g) Provide such other and further relief as this court deems just and proper.

## COUNT VIII - DISCRIMINATION - FAMILIAL STATUS

208.    The Plaintiffs incorporate herein paragraphs 1 through 12 as though fully set forth herein.

209.    This is a cause of action for discrimination on the basis of familial status in violation of 42 U.S.C. Section 3604(b).

210. At all times material hereto, the Association claimed that children could not play on certain common elements located near the Plaintiffs' home. In furtherance of this claim, the Association either installed or allowed others to install numerous "no trespassing" signs on the common elements at issue. The Association also voted to approve, and then enforced, the alleged no children playing rule.

211. Neither the Rules nor the Declaration prohibited children from playing on the common elements.

212. The common elements at issue were located near Plaintiff's unit. The only persons who accessed or used the common elements at issue was Janson Murphy, then a minor, and his minor friends, who would play on the common elements.

213. The Rules prohibited the "no trespassing" signs.

214. The Rules did not prohibit access to the common elements nor children playing on the common elements.

215. On several occasions, the Defendant, Argus, through Benford, notified the Plaintiffs that Janson Murphy and his friends could not play on the common elements due to the alleged no children playing rule..

216. Argus was hired by the Association to manage this subject condominium property. Its duties included advising the Association on matters that involved the condominium property, including the applicability of the Fair Housing Act. As the property manager for the Association, Argus also received training on the Fair Housing Act as part of its state licensing requirements. Argus personally advised the Association to engage in the above described conduct, and otherwise implemented

55

and enforced the Association's conduct described herein, all despite knowing that said conduct was a violation of the Plaintiffs' rights under the Fair Housing Act.

217.   Benford, as the employee of Argus and the individual property manager assigned to the subject condominium community on behalf of Argus, advised the Association on matters that involved the condominium property, including the applicability of the Fair Housing Act. As the property manager for the Association and an employee of Argus, she also received training on the Fair Housing Act as part of her state licensing requirements. Benford personally advised the Association to engage in the above described conduct, and otherwise implemented and enforced the Association's conduct described herein, all despite knowing that said conduct was a violation of the Plaintiffs' rights under the Fair Housing Act.

218.   The Defendants conduct discriminated against the Defendants because of familial status, in violation of 42 U.S.C. Section 3604(b).

219.   The Defendants' conduct described herein (a) was based on evil motive or intent, (b) involved reckless or callous indifference to Plaintiffs' federally protected rights, and (c) was done in the face if a perceived risk that said conduct violated the Act.

220.   Due to the discrimination, the Plaintiffs have been damaged, including attorneys fees and costs. They have also endured great emotional distress and embarrassment. Additionally, it has caused a deprivation of their rights to equal housing opportunities.

**WHEREFORE**, Plaintiff respectfully requests that this court:

(a) Assume jurisdiction of this action; and

(b) Declare the Defendants' actions complained herein to be in violation of the Fair Housing Act of 1968, as amended, 42 U.S.C.A. § 3604(b), et. seq.

(c) Order Defendants to take appropriate affirmative action to insure that the activities complained of are not engaged in again by Defendants or any of their agents; and

(d) Permanently enjoin Defendants, their agents, employees and successors from discriminating against any person in violation of the Fair Housing Act of 1968, as amended; and

(e) Award appropriate punitive and compensatory damages to Plaintiffs and against Defendants; and

(f) Award Plaintiffs' attorneys fees and costs pursuant to 42 U.S.C.A. § 3613(c)(2); and

(g) Provide such other and further relief as this court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 (b) of the Federal Rules of Civil Procedure, Plaintiffs demand a trial by jury on all issues.

**GIBSON, KOHL, WOLFF & HRIC, P.L.**
400 Burns Court
Sarasota, Fl. 34236
Telephone: (941) 362-8880
Facsimile: (941) 362-8881
Primary Email:legaljimjdg@comcast.net
Secondary Email:legaljimws2@comcast.net
Attorneys for Plaintiffs


By:_____
James D. Gibson
Fl. Bar No. 0709069

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true copy of the foregoing was delivered via e-mail through the courts portal to:

**CHRISTOPHER J. BLAIN, ESQUIRE**
Vernis & Bowling of the Gulf Coast, P.A.
3031 North Rocky Point Drive W. Suite 185
Tampa, FL 33607
Primary Email: Cblain@florida-law.com
Secondary E-mail: Lrivers@florida-law.com
Service E-mail: Tpafilings@florida-law.com
**RAYMOND A. HAAS, ESQUIRE**
HD Law Partners
P.O. Box 23567
Tampa, FL 33623
Primary Email: haas@hdlawpartners.com
Secondary E-mail: giddings@hdlawpartners.com
Supplemental E-mail: breneman@hdlawpartners.com

this 13th day of November, 2015.

                    **GIBSON, KOHL, WOLFF & HRIC, P.L.**
                    400 Burns Court
                    Sarasota, Florida 34236
                    Telephone: 941-362-8880
                    Facsimile: 941-362-8881
                    Primary Email:     legaljimjdg@comcast.net
                    Secondary Email: legaljimws2@comcast.net
                    Attorneys for Plaintiffs, **KIRSTEN SHEETS JASON KALAGHER AND JANSON MURPHY**


                    By: _____
                    James D. Gibson
                         Fla. Bar No. 0709069

cc: clients

JDG\sjs\F:\CLIENT FINAL\3000\14-3023\Matter VII - Federal complaint\Second Amended Complaint.wpd